IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAKE-A-WISH FOUNDATION<br>OF AMERICA<br>3550 N. Central Avenue, Suite 300<br>Phoenix, AZ 85012-2107<br><br>          Plaintiff,<br><br>     v.<br><br>LINDA M. SPRINGER, in her capacity as<br>Director of<br>United States Office of<br>Personnel Management<br>1900 E Street NW<br>Washington, DC 20415-1000<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. |

**MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR ENTRY OF**
**INJUNCTIVE AND RELATED RELIEF**

Michael J. Lyle (Bar No. 475078)
Christine P. Hsu (Bar No. 452209)
David N. Southard (Bar No. 470832)
Weil, Gotshal & Manges LLP
1501 K Street, N.W., Suite 100
Washington, D.C.   20005
Phone: (202) 682-7000
Fax: (202) 857-0940

Counsel for Plaintiff
Make-A-Wish Foundation of America

## STATEMENT OF POINTS AND AUTHORITIES

FACTUAL BACKGROUND ........................................................................................2

      For 18 consecutive years, plaintiff Make-A-Wish Foundation of America ('Make-A-Wish') participated in the Combined Federal Campaign ('CFC'), a giving program administered by the Office of Personnel Management ('OPM') that provides the only way charities can solicit federal employees and military personnel in the workplace.  OPM has denied Make-A-Wish's application for participation in the 2005 CFC, despite the fact that the very portions alleged to be inadequate were twice ratified by OPM through its approval of Make-A-Wish's 2003 and 2004 CFC applications.  Make-A-Wish sought to appeal the denial by proving that the true state of facts was that Make-A-Wish indeed met all criteria to participate in the 2005 CFC, but OPM refused to consider the proof, citing a nonexistent appellate standard.  OPM then refused to exercise its discretion to waive the applicable standards in view of the extenuating circumstances, even where it had done so for other similarly-situated charities. ...................................................2

ARGUMENT ........................................................................................................10

PRELIMINARY INJUNCTION STANDARD ..........................................................10

         *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ..........................................................10

         *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972 (D.C. Cir. 1985) .................................................10

A.    There is a Strong Likelihood That Make-A-Wish Will Prevail on the Merits of its Case. ................................................................11

         Administrative Procedure Act, 5 U.S.C. § 706(1) and (2)............11

    1.    OPM's Denial of Make-A-Wish's 2005 CFC Application Was Unjust, Arbitrary and Capricious...........................................11

         *National Center on Missing and Exploited Children v. Horner*, 699 F. Supp. 333 (D.D.C. 1988) ..........................12

    2.    OPM's Refusal to Consider Make-A-Wish's Form 990 Upon Appeal Was an Abuse of Discretion and Contrary to Law.........................13

         *Nebraska Dep't of Health and Human Svcs. v. United States Dep't of Health and Human Svcs.*, 340 F. Supp. 2d 1 (D.D.C. 2004) ..................................................14

         *National Center on Missing and Exploited Children v. Horner*, 699 F. Supp. 333 (D.D.C. 1988) ..........................14

    3.    OPM's Disparate Treatment of Make-A-Wish as Compared to Other Similarly-Situated Charities Proves the Arbitrary and Capricious Nature of its Decision to Deny Make-A-Wish's 2005 CFC Application ...................................................15

*Burlington N. and Santa Fe Ry. Co. v. Surface Transp. Bd.*,
 403 F.3d 771 (D.C. Cir. 2005)...........................................15

 4. The Director's Refusal to Exercise Her Discretion to Allow Make-
  A-Wish to Participate is an Abuse of Discretion. ......................17

  5 CFR § 950.205(e).......................................................17

B. Make-A-Wish Will Suffer Irreparable Injury If Preliminary Injunctive
 Relief Is Not Granted. .............................................................18

 *National Center on Missing and Exploited Children v.*
  *Horner*, 699 F. Supp. 333 (D.D.C. 1988) ..........................18

C. Third Parties Will Not Suffer Harm If Preliminary Injunctive Relief Is
 Granted In Make-A-Wish's Favor. .......................................19

 *National Center on Missing and Exploited Children v.*
  *Horner*, 699 F. Supp. 333 (D.D.C. 1988) ..........................19

D. Grant of Preliminary Injunctive Relief Will Serve The Public Interest.................20

 *National Center on Missing and Exploited Children v.*
  *Horner*, 699 F. Supp. 333 (D.D.C. 1988) ..........................20

CONCLUSION...............................................................................20

## INTRODUCTION

This action seeks declaratory and injunctive relief to allow Make-A-Wish Foundation of America ("Make-A-Wish") to participate in the 2005 Combined Federal Campaign ("CFC"), a giving program administered by the Office of Personnel Management ("OPM") that provides the only way that charities can solicit federal employees and military personnel in the workplace and through which those employees can contribute money from their paychecks to worthy charitable organizations like Make-A-Wish.

OPM's decision to exclude Make-A-Wish from the 2005 CFC violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) for several reasons.   First, OPM's denial of Make-A-Wish's application to participate in the 2005 CFC was predicated on a determination of ineligibility that was so arbitrary it cannot be reconciled with OPM's prior treatment of the very information it criticized, or its treatment of similar charities.   Second, OPM misinterpreted its own regulations when refusing to consider material information showing that the initial determination was improper.   Finally, in the face of uncontroverted facts showing that Make-A-Wish is eligible to participate in the 2005 CFC, the Director of OPM refused to include Make-A-Wish on the list of approved charities.

Absent the relief sought herein, Make-A-Wish will suffer irreparable harm because it will be denied access to a pool of donors whose contributions are consistent, generous, and impossible to access at their workplace in any other way.   Because OPM is immune from damages in this case, and because damages cannot be calculated with particularity, Make-A-Wish has no adequate remedy at law.   Make-A-Wish also will suffer irreparable harm to its reputation as a trustworthy charitable organization, because OPM's refusal to include it on the 2005 CFC undeniably suggests to the giving community that Make-A-Wish no longer meets the

standards of public accountability and trustworthiness demanded of charities participating in the CFC, despite the fact that it clearly does. Make-A-Wish will therefore be less able to attract new donors, maintain its contributor base, recruit volunteers and wish grantors, and fulfill its mission of granting the wishes of children who are facing life-threatening illnesses.

## FACTUAL BACKGROUND

In April 1980, a group of individuals joined together to grant the wish of a very sick 7-year old boy from Phoenix, Arizona, who dreamed of becoming a policeman. At the end of his adventure, the boy exclaimed, "This has been the best day of my life!" That boy passed away not long thereafter but, with the fulfillment of that first wish, the Make-A-Wish Foundation was born.

Although the founders initially intended only to serve sick children in the Phoenix area, public interest grew and the news media began to publicize the efforts of the fledgling organization. As a result, people throughout the United States and from countries around the world began to inquire about the possibility of forming Make-A-Wish chapters in their area.

In 1984, the national Make-A-Wish organization (the plaintiff herein) was formed to oversee the development of the chapters that had begun to arise, and to provide financial, operational, training, marketing and developmental guidance and support to such chapters. At the present time, there are 74 licensed Make-A-Wish chapters in the United States and its territories, each of which is a separately incorporated nonprofit organization that qualifies for tax exempt status under Section 501(c)(3) of the Internal Revenue Code. Declaration of Paul J. Velaski ("Velaski Decl.") ¶ 3, attached hereto at Tab 1.

As a result of the conscientious efforts of more than 25,000 dedicated Make-A-Wish volunteers across the country and a relatively modest number of hard-working employees, Make-

A-Wish has become the largest and most successful wish-granting organization in the world.

Attached as Exhibit A to the Velaski Declaration is a chart depicting the steadily increasing

number of wishes granted each year in the United States since 1985.   Velaski Decl. ¶ 4.

Collectively, Make-A-Wish and its chapters have granted the wishes of more than

125,000 children in the United States.   Velaski Decl. ¶ 5.   The wish experience often has a

profound effect not only on the wish child and his or her family, but also on dozens – sometimes

hundreds or even thousands – of other people who are involved in the wish.   This is what is

meant by the phrase "Share the Power of a Wish."

Over the years, Make-A-Wish has had the privilege of working closely with U.S.

Presidents, scores of government agencies and literally thousands of federal employees and

military personnel when granting children's wishes.   By way of illustration:

 a. Make-A-Wish children have met with every U.S. President since the organization was founded, including President Bush, who has granted 26 wishes to date, and President Clinton, who granted 47 wishes.

 b. Make-A-Wish has granted numerous wishes involving every branch of the military, including wishes "to be a Navy SEAL," "to be a soldier," and "to take off and land on an aircraft carrier at sea."

 c. A significant number of federal agencies have been directly involved in granting wishes, including the Department of Justice, the Federal Bureau of Investigation, (wish "to be an FBI agent"), the EPA (wish "to speak with someone in a position to do something about the environment"), and the INS (wish "to become a U.S. citizen").

 d. One particularly amazing wish granted in 2001 involved a boy whose wish was "to be the President for a Day."   In that role, he met with a number of government representatives, including representatives of the Secret Service, the Department of State, the Consumer Product Safety Commission, the Department of Defense, the FBI, IRS, the Department of Treasury, the Army, the Marine Corps, and even OPM (to which he advocated his and his classmates' desire for more "snow days").   Additional information about the "President for a Day" wish and one of the "Be a Soldier" wishes is attached as Exhibit C to the Velaski Declaration, along with a letter from an individual describing how profoundly the "Takeoff-and-Land on an Aircraft Carrier at Sea" wish affected the 5,000 men and women onboard the USS Eisenhower.

Velaski Decl. ¶ 7.

**The Combined Federal Campaign**

The CFC is an OPM-administered program that permits certain charitable organizations to solicit contributions from federal employees and military personnel at their workplace. Those employees who wish to do so can contribute to such organizations by having specified sums of money deducted from their paychecks. The CFC is the only mechanism by which charitable organizations are authorized to solicit federal employees and military personnel in the workplace, absent special circumstances approved by the federal government in cases of emergencies and disasters. 5 CFR § 950.102(a). Charitable organizations deemed by OPM to be nationally eligible are automatically included in each of the over 500 domestic CFCs and the CFC Overseas Campaign. *See* 5 CFR § 950.201.

In order to qualify for participation in the CFC, charitable organizations must meet certain "eligibility requirements" set forth in 5 CFR § 950.202, as well as "public accountability standards," described in section 950.203. Those public accountability standards were established "to protect federal employees against fraud and not to serve as a means of excluding groups that would otherwise be eligible." *See* H.R. Rep. No. 100-498 at 1173 (1987) (emphasis added).

One such standard requires charitable organizations seeking to participate on the national CFC list to calculate the percentage of their total support and revenues spent on "administrative and fund-raising" (commonly referred to as "AFR"). The standard further provides that:

> If an organization's administrative and fundraising expenses exceed 25 percent of its total support and revenue, it must certify that its actual [AFR] expenses . . . are reasonable under all the circumstances presented. It must provide an explanation with its application and also include a formal plan to reduce these expenses below 25 percent.

5 CFR § 950.203(a)(4)(i) (emphasis added).   If an organization's AFR exceeds 25 percent, the Director is permitted to reject its application.   Importantly, the Director may not reject that application if the organization can demonstrate to the Director "that its actual expenses for those purposes and its plan to reduce them are reasonable under the circumstances."   5 CFR § 950.203(a)(4)(ii).

Charitable organizations approved for participation in the CFC are listed in a booklet distributed to all federal employees and military personnel.   Persons wishing to contribute to any of the listed organizations simply designate the organizations and amounts they wish to contribute, and those amounts are deducted from the employee's paycheck and ultimately forwarded to the designated organizations.

As many as 30,000 charitable organizations currently participate in the CFC program. During the 2004 campaign, approximately 1.3 million federal employees (approximately one-third of all those given the opportunity) chose to participate by contributing some portion of their salary to an eligible organization.   By the end of last year's campaign, the CFC had distributed more than $256 million to those charitable organizations.   Declaration of Don Sodo ("Sodo Decl.") ¶ 3, attached hereto at Tab 2.

People in the habit of making charitable contributions through a workplace giving program like the CFC are less likely to make additional contributions independent of the CFC. Upon finding that an intended recipient organization is not listed in the CFC booklet, many federal employees participating in the CFC will simply give the funds they would have contributed to the unlisted organization to another organization that is listed.   Sodo Decl. ¶ 4.

Because the CFC is the only way charitable organizations can solicit federal employees and military personnel in their workplace, it is the only way an organization like Make-A-Wish

can target those persons with solicitations emphasizing how its activities have affected federal employees and military personnel.   Sodo Decl. ¶ 5.

## Make-A-Wish's Eighteen Years of Participation in the CFC

Make-A-Wish has qualified for, and has been included on, the national CFC list for each and every year since 1988.   Throughout that time, Make-A-Wish has participated in the CFC through America's Charities, a highly regarded fund-raising organization.   Sodo Decl. ¶ 6. During the past 18 years, literally tens (if not hundreds) of thousands of federal employees have designated Make-A-Wish as the beneficiary of their CFC contributions.   *Id.* ¶ 7.   Indeed, Make-A-Wish has consistently ranked among the top 25 charities (out of some 30,000) for total contributions received from federal employees and military personnel each year.   *Id.*

Since 1988, Make-A-Wish has received total CFC contributions in excess of $25 million, with annual amounts ranging between $1.2 million and $2.0 million in each of the past 16 years. Last year, Make-A-Wish received more than $1.35 million in contributions through the CFC. Velaski Decl. ¶ 8.

Make-A-Wish's participation in the CFC has provided a significant and reliable revenue stream upon which Make-A-Wish and its chapters have come to depend in fulfilling their charitable purpose.   Velaski Decl. ¶ 9.

## OPM's Approval of the Make-A-Wish Plan in 2003 and 2004

In its application for the 2003 CFC, Make-A-Wish disclosed that its AFR for fiscal year 2001 (which ended August 31, 2001) exceeded 25%.   Velaski Decl. ¶ 10.   In accordance with 5 CFR § 950.203(a)(4)(i), Make-A-Wish explained why its expenses were reasonable under the circumstances, and provided a formal plan for reducing such expenses below 25 percent that would yield material results by fiscal year 2004.   *Id.* and Ex. D.   OPM accepted the explanation

and plan submitted by Make-A-Wish as reasonable and allowed Make-A-Wish to participate in the 2003 CFC.   Velaski Decl. ¶ 11.

In its application for the 2004 CFC, Make-A-Wish disclosed that its AFR for fiscal year 2002 again exceeded 25%.   Velaski Decl. ¶ 12.   This shortfall was in large part attributable to changes in giving trends precipitated by the September 11 terrorist attacks.   *Id.*   Make-A-Wish again submitted the required explanation, and restated the plan submitted with the previous year's successful application, but revised the target for material improvements to fiscal year 2005.   *Id.* and Ex. E.   OPM again found the plan reasonable and accepted and approved the application, supported by the explanation and plan submitted by Make-A-Wish, and allowed Make-A-Wish to participate in the 2004 CFC.   Velaski Decl. ¶ 13.

### *Despite Previously Accepting and Approving Make-A-Wish's Plan to Reduce its AFR Percentage, OPM Rejects Make-A-Wish's Application to Participate in the 2005 CFC*

Make-A-Wish continued to implement its plan and expected that its plan would again be acceptable to OPM through at least 2005, especially given that the plan submitted in 2004 made clear that it would be in effect through fiscal year 2005.   Velaski Decl. ¶ 14.

In reliance on OPM's prior approvals of its plan, and in view of its 18 years of participation in the CFC, Make-A-Wish anticipated and budgeted for contributions from federal employees and military personnel through the 2005 CFC.   Velaski Decl. ¶ 15.

For its application to the 2005 CFC, Make-A-Wish submitted all required attachments including, *inter alia*, its 2003 IRS Form 990, an explanation of why its AFR was in excess of 25% and a status report of the plan approved by OPM the previous two years.   Velaski Decl. ¶ 16 and Ex. F.

On or about May 17, 2005, Make-A-Wish learned from America's Charities that OPM denied its application to participate in the 2005 CFC.   OPM's denial stated:

> [Make-A-Wish's] administrative and fundraising rate is 38.1%. Its application
> did not include an adequate Attachment F [the explanation and plan referred to
> above]. CFC eligibility regulations at 5 CFR §950.203(a)(4)(i) require
> submission of an explanation for an administrative and fundraising rate in excess
> of 25% and a formal plan to reduce the rate below 25 percent.

Velaski Decl. Ex. G. In other words, OPM had decided to deem "inadequate" in 2005 an

explanation and plan it had approved in 2003 and 2004.

### OPM Wrongly Denies Make-A-Wish's Appeal

On May 31, 2005, America's Charities, on behalf of Make-A-Wish, appealed OPM's

decision and submitted a further explanation of why Make-A-Wish's AFR percentage was in

excess of 25%, and what steps were in place to reduce it. *See* Velaski Decl. ¶ 18 and Ex. H.

To show that the plan was working as intended, Make-A-Wish included its Form 990 for the

most recently completed fiscal year. *Id.* ¶ 18. That document clearly shows that the steps

outlined in the explanation and plan submitted by Make-A-Wish had, in fact, succeeded in

reducing the organization's AFR to 24.1%, below the 25% limit set forth in 5 CFR

§ 950.203(a)(4). Thus, OPM could not properly deny Make-A-Wish's application because

Make-A-Wish had reduced its AFR below 25% and eliminated the only basis OPM offered for

denying the application.

On July 15, 2005, Make-A-Wish learned from America's Charities that OPM had

rejected its appeal, thereby sustaining its original denial of Make-A-Wish's application to

participate in the 2005 CFC. Velaski Decl. Ex. I. The Director's decision on the appeal is final

for administrative purposes. *See* 5 CFR § 950.205(f).

In a letter to America's Charities, OPM "explained" its decision by parroting the

regulatory language and asserting without elaboration that Make-A-Wish's plan was

"insufficient." As was the case with the initial denial, OPM failed to state how a plan that was

approved in 2003 and 2004 was insufficient in 2005, stating only that:

> OPM may reject an application with fundraising and administrative expenses in
> excess of 25 percent, unless the organization demonstrates that its explanation and
> formal plan are reasonable under the circumstances.   Upon review of the
> amended Attachment F, Make-A-Wish Foundation's plan for reduction of its
> administrative and fundraising expenses is insufficient.

Velaski Decl. Ex. I.

Moreover, OPM claimed that it could not consider the Form 990 showing the

success of its plan:

> Make-A-Wish Foundation's appeal included 2004 IRS Form 990 information to
> document an administrative and fundraising rate below 25 percent as part of an
> adequate plan by the organization.   We cannot consider an IRS Form 990 or
> other financial data that was not available at the time of the application deadline.

*Id.*   There is, however, no rule stating that OPM "cannot consider an IRS Form 990 or

other financial data that was not available at the time of the application deadline."

### The Director Refuses to Exercise Her Discretion to Allow Make-A-Wish to Participate

On July 21, 2005, Make-A-Wish wrote to defendant Springer, as Director of OPM,

explaining why Make-A-Wish was in compliance with the regulations, why its application

should have been granted, and why OPM's denial of its appeal was unjustified.   Velaski Decl

Ex. J.   In its letter, Make-A-Wish asked defendant Springer to use her discretion to resolve the

issue by exercising her discretion under 5 CFR § 950.203(e) to permit Make-A-Wish to

participate in the 2005 CFC.   *Id.*

On July 29, 2005, Make-A-Wish received a letter from Clarence Crawford, Chief

Financial Officer of OPM, rejecting Make-A-Wish's request for a waiver of the applicable

standards.   Velaski Decl. Ex. K.

On August 3, 2005, Make-A-Wish representatives met with OPM staff to discuss this

matter.   On August 11, 2005, Make-A-Wish received a letter from Mara T. Patermaster,

Director of the Office of CFC Operations, stating that "OPM has determined that the decision

upholding the initial denial of your organization's appeal will stand." Velaski Decl. Ex. L.   In

this letter, OPM stated that

> We maintain a uniform policy of not accepting information that
> supplements the original application if the information was not
> available at the time of the application deadline.   As a result, we
> regret we must decline to accept your organization's 2004 IRS
> Form 990, which was not available as of the 2005 CFC application
> deadline, as evidence that MAWFA's plan to reduce its AFR is
> reasonable under the circumstances.

*Id.*

## ARGUMENT

## PRELIMINARY INJUNCTION STANDARD

The standard governing requests for temporary and preliminary injunctive relief is well-

settled.   To establish that it is entitled to such relief, Make-A-Wish must show (1) a likelihood

of prevailing on the merits of its claim; (2) a threat of irreparable harm if the requested relief is

not granted; (3) that the issuance of an injunction will not harm other interested parties; and

(4) that the public interest favors the requested injunction.   *Wisconsin Gas Co. v. FERC*, 758

F.2d 669, 674 (D.C. Cir. 1985).   *See also Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d

921, 925 (D.C. Cir. 1958) (per curiam); *Washington Metro. Area Transp. Comm'n v. Holiday*

*Tours, Inc.*, 559 F.2d 841, 843-44 (D.C. Cir. 1977).

The standard is a flexible one; Make-A-Wish is not required to prevail on each of the

factors.   Rather, "[i]f the arguments for one factor are particularly strong, an injunction may

issue even if the arguments in other areas are rather weak."   *CityFed Fin. Corp. v. Office of*

*Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).   Thus, injunctive relief may be granted

"with either a high probability of success and some injury or vice versa."   *Cuomo v. United*

*States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

**A.    There is a Strong Likelihood That Make-A-Wish Will Prevail on the Merits of its Case.**

OPM's denial of Make-A-Wish's 2005 CFC application is an agency decision reviewable under section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.   Pursuant to this provision, this Court is, in relevant part, empowered to

>  (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
>  (2) hold unlawful and set aside agency action, findings, and conclusions found to be –
>
>>  (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...

5 U.S.C. § 706(1) and (2).   Because OPM's denial of Make-A-Wish's 2005 CFC application and affirmation on appeal were arbitrary and capricious, and because the Director abused her discretion in refusing to allow Make-A-Wish to participate, there is a strong likelihood that Make-A-Wish will prevail on the merits of its case.

>  1.    OPM's Denial of Make-A-Wish's 2005 CFC Application Was Unjust, Arbitrary and Capricious.

When Make-A-Wish disclosed in its 2003 CFC application that its AFR had risen above 25%, it immediately prepared an explanation for the increase and a multi-year plan for lowering its AFR percentage.   OPM allowed Make-A-Wish to participate in the 2003 CFC, leading Make-A-Wish to conclude that, having reviewed the submitted explanation and plan, OPM deemed them "reasonable under the circumstances" for purposes of 5 CFR § 950.203(a)(4)(ii).   Consequently, Make-A-Wish adopted the proposed plan and took steps to implement it.

Relying on OPM's 2003 acceptance of the explanation and plan, Make-A-Wish submitted the same plan with its 2004 CFC application, reported on the progress made and – in view of the unforeseeable change in giving trends precipitated by the September 11 terror attacks – revised the target date for material improvements to fiscal year 2005.   OPM allowed Make-A-

Wish to participate in the 2004 CFC, as it had in 2003, a fact that led Make-A-Wish to

reasonably conclude that OPM had again determined that its plan to achieve material

improvements by fiscal year 2005 was "reasonable under the circumstances" for purposes of the

applicable regulations.   On that basis, Make-A-Wish continued to implement its plan to reduce

its AFR percentage.

Given the approvals in 2003 and 2004, OPM cannot possibly justify its sudden refusal to

approve Make-A-Wish's 2005 CFC application.   Indeed, if the plan was reasonable and

adequate in 2003 and 2004, it is plainly arbitrary and capricious for OPM to determine that the

same plan is somehow not adequate in 2005.   This Court has not hesitated to enjoin OPM from

treating an entity differently from year to year where the facts underlying the treatment remained

unchanged.   In *National Center on Missing and Exploited Children*, the Court confronted an

OPM decision denying plaintiff's application for the CFC on the grounds that plaintiff failed to

satisfy one of the criteria in 5 CFR § 950.203.   The Court overturned OPM's decision and

granted a preliminary injunction, ruling, *inter alia*, that OPM could not disqualify a charity from

participating in the CFC where the charity operated in a fashion that OPM ratified in preceding

years:

> [F]or the past three years, during which time the 1984 provision cited by OPM
> was in effect, NCMEC and the Endowment operated in a fashion identical to that
> which OPM now questions.   And, in each of those years, NCMEC's application
> was approved by OPM or a subordinate LFCC. . . . I am unwilling to permit the
> interpretation of the 1984 provision in a fashion inconsistent with prior
> application.

*National Center on Missing and Exploited Children v. Horner*, 699 F. Supp. 333, 337 (D.D.C.

1988) (granting preliminary injunction against OPM).   For the same reasons, OPM cannot

exclude Make-A-Wish from the 2005 CFC by claiming that its twice-approved plan has become

"insufficient."

OPM's finding of inadequacy is made all the more offensive because it gave no indication during the previous two years that the submitted plan was in any way deficient or inadequate. Because Make-A-Wish reasonably relied on OPM's acceptance of the plan in 2003 and 2004 in deciding to resubmit the plan as part of its 2005 CFC application, OPM cannot now claim that the previously-acceptable plan is "insufficient." The fact that OPM reached two vastly different conclusions upon review of the same plan is the very definition of "arbitrary and capricious." Thus, OPM's denial of Make-A-Wish's 2005 CFC application should be set aside as a violation of the APA.

>    2.    OPM's Refusal to Consider Make-A-Wish's Form 990 Upon Appeal Was
>          an Abuse of Discretion and Contrary to Law.

Make-A-Wish appealed OPM's denial of the 2005 Application and to support that appeal offered information showing that its plan was in fact reasonable and adequate. Specifically, Make-A-Wish provided its 2004 IRS Form 990, which proved that its plan worked in decreasing the AFR to below 25%. Make-A-Wish submitted this evidence because there can be no better proof of the adequacy of a plan than proof that the plan actually worked and achieved the results sought.

In rejecting Make-A-Wish's appeal, however, OPM declared the Make-A-Wish plan "insufficient." OPM further claimed that it was prohibited from considering the 2004 IRS Form 990 – which Make-A-Wish supplied as proof that the plan was sufficient – because "it cannot consider an IRS Form 990 or other financial data that was not available at the time of the application deadline." OPM's decision is arbitrary and contrary to law. As an initial matter, there is no regulation precluding OPM from considering the 2004 IRS Form 990. A policy that adds a requirement not found in the relevant statute and regulation is a substantive rule that is invalid unless it is promulgated with notice and comment. *See e.g.*, *United States v. Piccotto*,

875 F.2d 345, 348 (D.C. Cir. 1989); *Nebraska Dep't of Health and Human Svcs. v. United States Dep't of Health and Human Svcs.*, 340 F. Supp. 2d 1, 18-22 (D.D.C. 2004). In other words, the law prohibits OPM from unilaterally creating a "policy" and using it to deny Make-A-Wish's appeal, as it has done in this case. Indeed, in *National Center on Missing and Exploited Children*, the Court overturned OPM's decision because, *inter alia*, it was based on an ambiguous regulation. 699 F. Supp. at 335-37. Here, OPM's decision is far more egregious and must be overturned because this decision was based on a non-existent regulation. Because OPM can cite no rule or regulation to bar the consideration of evidence clearly establishing Make-A-Wish's eligibility to participate in the 2005 CFC, OPM's rejection of Make-A-Wish's appeal must be set aside.

Moreover, even assuming *arguendo* that OPM correctly refused to consider uncontroverted proof that Make-A-Wish's plan was reasonable, this Court can consider the 2004 IRS Form 990 in this proceeding as a basis for overturning OPM's decision. The D.C. Circuit has recognized that it may review even extra-record evidence (which the 2004 IRS Form 990, properly submitted to the OPM pursuant to the applicable regulations, is not) in a number of instances, including "when the agency failed to consider factors which are relevant to its final decision," "in cases where evidence arising after the agency action shows whether the decision was correct or not," and "in cases where relief is at issue, especially at the preliminary injunction stage." *See American Rivers v. United States Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 247 (D.D.C. 2003) (citing cases, and granting preliminary injunction). Here, OPM refused to consider highly relevant information contained in the 2004 IRS Form 990. This information unequivocally shows that Make-A-Wish satisfies all the criteria for participating in the 2005 CFC. Thus, pursuant to *American Rivers*, this Court can and should overturn OPM's decision,

where the 2004 IRS Form 990 provides uncontested proof that Make-A-Wish is entitled to

participate in the 2005 CFC.

3.    OPM's Disparate Treatment of Make-A-Wish as Compared to Other
Similarly-Situated Charities Proves the Arbitrary and Capricious Nature of
its Decision to Deny Make-A-Wish's 2005 CFC Application.

It is axiomatic that, where an agency applies different standards to similarly situated

entities and fails to support this disparate treatment with a reasoned explanation and substantial

evidence in the record, its action is arbitrary and capricious and cannot be upheld.  *See*

*Burlington N. and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776-77 (D.C. Cir.

2005).  OPM's treatment of Make-A-Wish's application to participate in the 2005 CFC was

inconsistent with that afforded other similarly situated applicants with regard to objective factors

such as the AFR percentage.   As such, the decision to reject Make-A-Wish's 2005 CFC

application was arbitrary and capricious in violation of the APA.

As the chart below makes clear, OPM has permitted a steadily increasing number of

charities to participate in the CFC despite having increasingly high average AFRs in excess of

25%.

| CFC Year | No. of Charities with AFRs > 25% | Average AFR |
|----------|----------------------------------|-------------|
| 2001 | 84 | 29.69% |
| 2002 | 94 | 30.09% |
| 2003 | 135 | 30.19% |
| 2004 | 175 | 32.66% |
| 2005 | 187 | 32.25% |

*See* Sodo Decl. ¶ 10.

Even if Make-A-Wish had not reduced its AFR to below 25% this past fiscal year – and

as the 2004 IRS Form 990 makes clear, it did – there would have been no legitimate basis for

OPM to disqualify Make-A-Wish from participating in the 2005 CFC.   In fact, that decision

would have been wholly inconsistent with numerous eligibility determinations made by OPM in recent years involving charitable organizations that are similarly situated to Make-A-Wish. Sodo Decl. ¶ 11.

In the past two years, OPM has even deemed eligible for participation in the CFC a number of charitable organizations with AFRs in excess of 40%. This year, 19 such organizations were approved:

| Charity | 2005 AFR |
| --- | --- |
| Africa Action | 66.5% |
| Boys' Town of Italy, Inc. | 49.9% |
| Catholic Youth Foundation | 43.0% |
| Catholics for a Free Choice | 41.0% |
| Children's Hosp. & Research Center | 147.4% |
| Children's Relief Network | 40.8% |
| Enersol Associates | 48.6% |
| Fishburne Military School | 48.2% |
| Foundation for International Medicine | 55.4% |
| Indian Land Tenure Foundation | 78.0% |
| John Tracy Clinic | 44.2% |
| Miracle Flight for Kids | 41.0% |
| Ms. Foundation for Women | 112.4% |
| Multiple Sclerosis Association of America | 42.2% |
| NAACP Special Contribution Fund | 41.4% |
| NASA College Scholarship Fund | 51.2% |
| National Eating Disorders Association | 40.2% |
| Operation Smile | 41.6% |
| Vietnam Vets of America Foundation | 43.8% |

Sodo Decl. ¶ 13.

Moreover, OPM's refusal to consider Make-A-Wish's 2004 Form 990 as evidence of the sufficiency of its plan is inconsistent with OPM's past practice with regard to other charities. For example, last year, National Down Syndrome Society ("NDSS") appealed OPM's determination that it was ineligible for the same reason Make-A-Wish's application was denied this year (an AFR in excess of 30% and an allegedly inadequate explanation and plan for reducing it). Reversing its initial determination, OPM did precisely what it has steadfastly

refused to do here – it considered additional materials submitted by NDSS in conjunction with the appeal, including more recent draft financial statements showing that NDSS's AFR had dropped below 25 percent for the next fiscal year. Sodo Decl. ¶ 14.

If OPM had considered Make-A-Wish's most recent financial information – as the regulations permit it to do, and as it has, in fact, done with other charities – it would have had no choice but to reverse its initial determination because, having reduced its AFR to 24.10%, and having a submitted a plan that was twice deemed reasonable and adequate by OPM, Make-A-Wish undeniably meets all of the public accountability and other eligibility standards set forth in 5 CFR §§ 950.202 and 950.203.

> 4.    The Director's Refusal to Exercise Her Discretion to Allow Make-A-Wish to Participate is an Abuse of Discretion.

The applicable regulations give OPM the authority to allow Make-A-Wish to participate regardless of any perceived issues with respect to its application. *See* 5 CFR § 950.205(e). As such, Make-A-Wish prevailed upon OPM's common sense in a letter calling attention to the fact that <u>Make-A-Wish's AFR percentage is below the 25% threshold</u> and noting that, as a result, Make-A-Wish is presumptively eligible for participation in the 2005 CFC. This approach would obviate any need to evaluate an explanation or plan for reducing the AFR percentage – the source of OPM's denial of Make-A-Wish's 2005 CFC application in the first instance. OPM responded, reiterating its unsupportable position that it could not consider the 2004 IRS Form 990. Velaski Decl. Ex. K. OPM's myopic focus on this limitation (which finds no support in the regulations) puts "form over function" and allows OPM to continue to ignore the very document that proves that Make-A-Wish's plan was sufficient, and that its AFR percentage is within the regulatory guidelines. For this reason – and the other reasons articulated above – the

Director abused her discretion to allow Make-A-Wish to participate notwithstanding any perceived deficiencies with respect to its application.

**B.    Make-A-Wish Will Suffer Irreparable Injury If Preliminary Injunctive Relief Is Not Granted.**

Unless permitted to participate in the 2005 CFC, Make-A-Wish will clearly suffer irreparable harm. Indeed, absent the relief sought herein Make-A-Wish will be cut off from a generous group of donors that consistently provides significant support, and is impossible to access in the federal workplace in any other way. Over the 18 years that Make-A-Wish has participated in the CFC, it has received and relied upon total contributions in excess of $25 million, with annual amounts ranging between $1.2 million and $2.0 million in each of the past 16 years. Velaski Decl. ¶ 8. The amount of contributions that Make-A-Wish will lose if not allowed to participate in the 2005 CFC cannot be calculated with particularity, although it is plainly a substantial sum. *National Center on Missing and Exploited Children*, 699 F. Supp. at 337 (irreparable harm occurred because lost federal employee contributions were irreplaceable).

Even if the amount of lost contributions could be quantified with particularity, Make-A-Wish has no adequate remedy at law where OPM is immune from damages arising from administrative decisions. *See, e.g., Clark v. Library of Congress*, 750 F.2d 89, 102-03 (D.C. Cir. 1984).

OPM's decision to exclude Make-A-Wish from the CFC, after 18 years of uninterrupted participation, also threatens to damage irrevocably Make-A-Wish's enviable reputation – a reputation that has allowed it to work closely with countless government agencies, and many sitting Presidents of the United States. Removing Make-A-Wish from the CFC will send the mistaken message that Make-A-Wish no longer meets the standards of public accountability and trustworthiness demanded of charities participating in the CFC. This impression will

irreparably harm Make-A-Wish's reputation, and will surely undermine and disrupt the ability of Make-A-Wish to solicit critical donations and wish-granting support – not only from the federal employees and military personnel targeted by the CFC, but from other potential supporters, including corporations, foundations, and individuals.

## C.    Third Parties Will Not Suffer Harm If Preliminary Injunctive Relief Is Granted In Make-A-Wish's Favor.

Other interested parties will not suffer harm if the relief requested by Make-A-Wish is granted. The relief Make-A-Wish seeks is narrow:   an order precluding OPM from printing, publishing, or distributing any CFC list prior to an adjudication on the merits of this litigation. This narrow relief would also be of limited duration, because Make-A-Wish is prepared to litigate the merits of this matter as soon as possible within the Court's schedule.  And given that the merits turn on the law applicable to a straightforward set of facts, that merits hearing could be convened and concluded quickly.   Moreover, the campaign can occur in any six week period between September 1 and December 15, 2005.  5 CFR § 950.102(a).

In any event, where necessary, OPM has accommodated late additions to the CFC before. *See* "Stipulated Statement to be Distributed" (attached hereto at Tab 3), filed in *National Center on Missing and Exploited Children*, 699 F. Supp. at 337-38) (granting motion for preliminary injunction against OPM and ordering inclusion of plaintiff charity after start of campaign); *National Conference on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 51 (D.D.C. 2003) (discussing inclusion of three charities in CFC upon settlement of lawsuits against OPM). Even if it is later determined that Make-A-Wish was mistakenly included in the 2005 CFC (an unlikely determination), the funds designated for Make-A-Wish by donors can easily be placed in the undesignated pool for distribution to other charities.  *See* "Stipulated Statement to be

Distributed" at ii.   Thus, other charities will not be harmed by any wrongful inclusion of Make-A-Wish.

### D.    Grant of Preliminary Injunctive Relief Will Serve The Public Interest.

The public interest would undoubtedly be served by Make-A-Wish's continued participation in the CFC.   Make-A-Wish has been a part of the CFC for the past 18 years, and thanks to the more than $25 million in donations received from federal employees and military personnel through the CFC over the years, Make-A-Wish has been able to grant the wishes of over 125,000 sick children.   The value of this work has been recognized and supported by every U.S. President since the founding of the organization; President Bush himself has granted 26 wishes to date through Make-A-Wish, and President Clinton granted 47.   Allowing Make-A-Wish to participate in the 2005 CFC will enable Make-A-Wish to continue its important and uplifting mission.   The public interest is not served by upholding a capricious and arbitrary decision where Make-A-Wish has legitimately satisfied all requirements for participation in the 2005 CFC.   *National Center on Missing and Exploited Children*, 699 F. Supp. at 337-38 ("OPM has failed to recognize that the public interest is not served by frustrating a qualified charitable organization's attempt to participate in the CFC.")

### CONCLUSION

For the foregoing reasons, Make-A-Wish respectfully requests that the Court enter an order enjoining OPM from printing, publishing, or distributing to federal employees any materials related to the 2005 CFC prior to the resolution of the merits of this proceeding.

Dated: August 18, 2005
        Washington, D.C.

Respectfully submitted,

_____
Michael J. Lyle (Bar No. 475078)
Christine P. Hsu (Bar No. 452209)
David N. Southard (Bar No. 470832)
Weil, Gotshal & Manges LLP
1501 K Street, N.W., Suite 100
Washington, D.C.   20005
Phone: (202) 682-7000
Fax: (202) 857-0940

Counsel for Plaintiff
Make-A-Wish Foundation of America